UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                                Case No.

Quail Travel Group, S.A.,                                  Chapter 15

    Debtor in a foreign proceeding.

_____/

### DECLARATION OF ÁNGEL JUAN MIRÓ MARTÍ

In accordance with 28 U.S.C. § 1746, I, Ángel Juan Miró Martí, declare:

1. I am over the age of 18 and I make this statement in support of the Chapter 15 bankruptcy petition of Quail Travel Group S.A. ("Quail Travel").

2. I make this declaration based on my personal knowledge and based on the files and records of and relating to Quail Travel.

3. I am the court-appointed Insolvency Administrator for the bankruptcy of Debtor Quail Travel Group, S.A. before the Juzgado de Lo Mercantil No. 10 in Madrid, Spain (the "Spanish Mercantile Court"). As the Insolvency Administrator, I am authorized to initiate the above-captioned Chapter 15 proceeding.

4. I am a partner with ADDITIO Group ("ADDITIO"), an economic and legal consulting firm comprised of economists and lawyers who specialize in, among other things, insolvency administration. ADDITIO's members have served as court-appointed insolvency administrators in over 120 Spanish insolvencies over the last ten years.

5. I am an economist and a lawyer, and am licensed to practice law in Spain. I am qualified to give an opinion on the Spanish Insolvency Act known as the Ley 22/2003, de 9 de Julio, Concursal (the "Spanish Insolvency Act" or the "Act").

**Quail Travel**

6. Quail Travel is a sociedad anónima (a corporation) organized and existing under the laws of the Kingdom of Spain.

7. Formed on November 7, 2007, Quail Travel was engaged in the cruise industry. Specifically, Quail Travel commercialized packages for cruises operated by other companies and sold the packages to travel agencies, which would then sell those packages to customers. Quail Travel operated primarily in the European market.

8. Quail Travel's principal place of business has always been in Madrid, Spain. All of its directors and officers are in Madrid, including its acting sole administrator, Jesús Molina Molina. Quail Travel's main office is located in Madrid, and Quail Travel has no offices outside Spain. All of Quail Travel's 36 employees were based in Spain.

9. Additionally, six of Quail Travel's eight shareholders are located in Madrid: Javier Gomez-Navarro Navarrete (12.67% shareholder); Alfonso López Pérez (12.67% shareholder); María Eulalia Pinilla (12.67% shareholder); Vinillas S.L. (12.67% shareholder); Asesoría Bojaca S.L. (6.33% shareholder); and Abdelmalek Alkarea Aboulkassem (2.53% shareholder). Quail Travel's other two shareholders—Globalia Corporación Empresarial S.A. (21.52% shareholder) and VPB Representações e Participações Ltda. (18.99% shareholder)—are located in Palma de Mallorca and Brazil, respectively.[1]

---

[1] As explained below, effective on or about April 9, 2013, VPB Representações e Participações Ltda. withdrew as a shareholder of Quail Travel as part of a global settlement agreement between Quail Travel and various other parties.

**Quail Travel's Bankruptcy**

10. In 2011, Quail Travel became insolvent because of the downturn in the Spanish and European economies and because of financial problems that Quail Travel experienced in connection with the acquisition of the passenger cruise ship the *M/V Pacific* (the "*Pacific*").

11. On February 3, 2012, the Spanish Mercantile Court entered an order declaring that voluntary bankruptcy proceedings were opened for Quail Travel (the "Spanish Proceeding"), and staying all proceedings against Quail Travel and its assets (the "Order Declaring Bankruptcy"). A copy of the Order Declaring Bankruptcy and a certified English translation of same is attached as **Exhibit 1**. The Spanish Mercantile Court also appointed ADDITIO to serve as the insolvency administrator of Quail Travel.

12. On February 16, 2012, I accepted the court's appointment as the insolvency administrator of Quail Travel. A copy of the Acceptance of the Appointment as Insolvency Administrator and a certified English translation of same is attached as **Exhibit 2**.

13. As Insolvency Administrator, my responsibilities include, among other things, making reports and recommendations to the Spanish Mercantile Court regarding the affairs of Quail Travel; marshalling, preserving, and managing the assets of Quail Travel; and overseeing the eventual distribution of those assets for the benefit of Quail Travel's creditors.

14. The Spanish Proceeding is being conducted in accordance with the Spanish Insolvency Act. A copy of the Act and an English translation of same provided by the Spanish Ministry of Justice is attached as **Exhibit 3**.

**The Spanish Insolvency Act**

15.     The Mercantile Courts of Law are competent to hear and decide insolvency proceedings. Act art. 8. The Spanish Mercantile Court's jurisdiction "is exclusive" and "excludes" all other courts' jurisdictions, with few exceptions. *Id.*

16.     Further, "[t]he competence to declare and deal with the insolvency lies with the Mercantile Court of Law in whose territory the debtor has the centre of his main interests." *Id.* art. 10. "The effects of this insolvency, which shall be considered the 'main insolvency proceedings' from an international perspective, shall have a universal scope, including all the assets of the debtor, whether they are located within or without Spain." *Id.*

17.     After the insolvency proceedings are declared open, a stay or suspension of all actions, with limited exceptions, against the debtor comes into effect (the "Spanish stay"). *See id.* title III, ch. II. The Order Declaring Bankruptcy recognized this Spanish stay. The Spanish stay applies to actions by creditors to secure assets of the debtor.

18.     Assets of the estate are described in Chapter II of Title IV of the Act. "The aggregate assets of the insolvency proceedings are the properties, goods and rights forming part of the debtor's estate on the date of declaring the insolvency proceedings open and those reintegrated thereto or acquired until conclusion of the proceedings." *Id.* art. 76.1.

19.     The insolvency administrator must "draw up an inventory [of the aggregate assets] as soon as possible." *Id.* art. 82.1.

20.     The Act contains procedures by which claims against the estate may be "lodged." *See id.* title IV, ch. III. Claims may be recognized as preferential, ordinary, or subordinated. *See id.* art. 89.

21.     The Act requires a list of creditors to be named. *See id.* art. 94. It also contains procedures to amend the list. *See id.* arts. 96–97. By April 16, 2013, there were 113 creditors participating in the Spanish Proceeding.

22.     All creditors—domestic or foreign—are treated equally under the Act. *See id.* art. 49(1) ("Once the insolvency proceedings are declared open, all the debtor's creditors … whatever their nationality and domicile, shall be legally integrated in the aggregate liabilities of the Insolvency proceedings, with no exceptions other than those established by laws."). Further, the Act contains procedures for foreign creditors to lodge claims. *Id*. at art. 217. Additionally, the Act contains a procedure to recognize foreign insolvency proceedings. *Id*. arts. 220–26.

23.     Currently, Quail Travel has an approximate €14 million financial deficit. Quail Travel is waiting to receive $5 million in settlement proceeds (described below) so that it can negotiate a plan with its creditors, have the Spanish Mercantile Court rule on any objections to the plan, and then distribute the assets to its creditors before liquidating.

24.     Because of litigation in the United States, receipt of the settlement proceeds has been held up, preventing the Spanish Proceeding from concluding.

**The Disputes Regarding the *Pacific***

25.     On or about June 1, 2008, Quail Cruises Ship Management, Ltd. ("Quail Cruises"), a Bahamian ship-operating corporation that is a wholly owned subsidiary of Quail Travel, entered into an agreement to buy all the stock of Templeton International, Inc. ("Templeton"), a Bahamian corporation, for €10,200,000. Templeton's principal asset was the *Pacific*—better known as the Love Boat of the 1970s and 80s television show. In connection with the stock-purchase agreement, on June 4, 2008, Quail Travel executed a guaranty in favor

of Flameck International S.A. ("Flameck"), seller of the Templeton stock, by which Quail Travel agreed to guarantee the purchase price of the Templeton stock.

26. Within months of the acquisition, it became apparent that the *Pacific* was structurally and mechanically deficient, and by October 2008, regulators deemed the *Pacific* no longer seaworthy.

27. In November 2008, the *Pacific* was granted permission to sail from Spain to Italy to assess the degree of repair work needed to recertify the vessel. As a result of these inspections, Quail Travel agreed to spend significant sums to repair the *Pacific*. As time passed, more deficiencies were uncovered that required extensive repair. By mid-2009, Quail Travel had spent and became indebted for millions of Euros to repair the *Pacific*. This indebtedness, along with the downturn in the European economy, eventually led to Quail Travel's insolvency.

28. In October 2009, Quail Cruises filed an action in the U.S. District Court for the Southern District of Florida against Agencia de Viagens CVC Tur Limitada n/k/a Operadora e Agencia de Viagens Tur Ltda. ("CVC"), Valter Patriani (CVC's president), Seahawk North America, LLC ("Seahawk"), Rodolfo Spinelli (Seahawk's president), and Lloyd's Register North America, LLC (collectively, "Defendants"). *See Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, No. 09-cv-23248-PCH (S.D. Fla. filed Oct. 26, 2009) (the "*Pacific I* action").

29. In the *Pacific I* action, Quail Cruises alleged that the Defendants fraudulently induced Quail Cruises to buy Templeton (and the *Pacific*) from Flameck. Specifically, Quail Cruises alleged that the Defendants conspired to induce it to purchase the Templeton stock by concealing and fraudulently misrepresenting the *Pacific*'s deteriorating and unsafe condition.

30.     In February 2011, Flameck initiated an arbitration (the "*Pacific II* action") before the International Centre for Dispute Resolution against Quail Travel and Quail Cruises demanding payment from Quail Travel and Quail Cruises of the €10,200,000 purchase price plus interest thereon

31.     In the *Pacific II* action, Quail Travel and Quail Cruises filed a Statement of Defense and Setoff, requesting that the arbitrators set-off the damages caused by Flameck and the *Pacific I* defendants' alleged fraudulent conduct against any amounts owed to Flameck for the purchase of the Templeton shares.

**The Global Settlement Agreement**

32.     On or about July 31, 2012, all the parties to the *Pacific I* and *Pacific II* actions—Quail Travel, Quail Cruises, CVC, Patriani, Seahawk, Spinelli, and Flameck—entered into a Confidential Global Settlement Agreement and Mutual Release (the "Settlement Agreement") wherein, as explained below, the parties agreed to resolve the *Pacific* actions and all other disputes and controversies between the parties, including any disputes or controversies that were contemplated in the Spanish Proceeding.

33.     In connection with the Settlement Agreement, on or about July 31, 2012, Quail Travel also entered into an Agreement of Withdrawal, Authorized Redemption, and Release of Rights (the "Withdrawal Agreement") with VPB Representações e Participações Ltda. ("VPB"), a shareholder of Quail Travel. VPB, in turn, was owned or controlled by Patriani. By the Withdrawal Agreement, VPB agreed to withdraw as a shareholder of Quail Travel in exchange for mutual releases, and Quail Travel agreed to indemnify VPB and Patriani from all claims arising out of VPB's participation in or relationship to Quail Travel. The Settlement Agreement and Withdrawal Agreement are collectively referred to as the "Global Settlement Agreement."

34. I, along with Quail Travel's Sole Administrator, Jesus Molina Molina, negotiated the principal terms of the Global Settlement Agreement. Additionally, I authorized and signed the Global Settlement Agreement.

35. By its terms, the Global Settlement Agreement would become effective only when the Spanish Mercantile Court entered an order approving it or stating that its approval was not required.

36. On or about April 9, 2013, the Spanish Mercantile Court entered an order stating that court approval was not required because I had authorized the Global Settlement Agreement. Thus, the Global Settlement Agreement became effective on or about April 9, 2013.

37. Under the Global Settlement Agreement, the $5 million in settlement proceeds became due and owing by CVC to Quail Travel (the "Settlement Proceeds") upon the agreement becoming effective.[2] In negotiating the Global Settlement Agreement, I insisted on behalf of the creditors that Quail Travel would be the recipient of the Settlement Proceeds. This is so because pursuant to the Global Settlement Agreement, Quail Travel agreed to release Flameck, CVC, Patriani, Seahawk, and Spinelli from any and all claims that Quail Travel could bring in the Spanish Proceeding or elsewhere notwithstanding the fact that, as explained above, Quail Travel—in addition to having guaranteed Quail Cruises' payment for the acquisition of Templeton—lost millions of Euros in paying for repairs to the *Pacific*. This, as explained above,

---

[2] Specifically, the Settlement Agreement provides that the Settlement Proceeds "be paid to the Quail Group . . . in accordance with the procedures set forth on Exhibit A." While the "Quail Group" is defined to include Quail Travel and Quail Cruises, Exhibit A instructs that the Settlement Proceeds shall be paid as directed by the "Quail Group Authorized Person" who is identified as "Jesus Molina Molina, Quail Travel Group, S.A., Sole Administrator." Thus, it is clear that the Settlement Proceeds would be going to Quail Travel, which is the reason, in large part, why the Settlement Agreement needed to be presented to the Spanish Mercantile Court. Further, the parties were aware that Quail Travel was in bankruptcy proceedings and it was always understood and it was agreed on by the parties that the Settlement Proceeds would be owed to Quail Travel.

8

played a significant role in Quail Travel's insolvency. Further, pursuant to the Global Settlement Agreement, Quail Travel allowed VPB to withdraw from Quail Travel with Quail Travel agreeing to indemnify VPB and Patriani from any and all claims arising from their participation in or relationship to Quail Travel. I note that three participating creditors objected to the Global Settlement Agreement, arguing that Quail Travel should have received more than $5 million.

38. As Insolvency Administrator and under Spanish law, I work in the interests of the creditors of Quail Travel. I would not have executed the Global Settlement Agreement had the Settlement Proceeds not been destined to pay Quail Travel's creditors.

**Litigation in the United States Paralyzing the Spanish Proceeding**

39. To date, Quail Travel has not received the Settlement Proceeds because of litigation pending in the United States.

40. I have been informed that in one action, styled *Hainan Cruise Enterprise S.A. v. Happy Cruises S.A.*, No. 12-cv-24016-JLK (S.D. Fla. filed Nov. 6, 2012) (the "*Hainan* action"), the plaintiff, Hainan Cruise Enterprise S.A. ("Hainan"), has sued Happy Cruises, S.A. ("Happy Cruises"), Quail Travel, and Quail Cruises under federal admiralty and statutory law for the purpose of obtaining security for a foreign arbitration, and has alleged that Happy Cruises and Quail Cruises are the alter egos of Quail Travel, and that the assets of any of these entities should be held liable to satisfy the debts of any others.

41. Happy Cruises, a Panamanian cruise-operating company, is not an alter ego of Quail Travel. It is neither owned nor controlled by Quail Travel. Rather, Quail Travel served to commercialize the cruises that were operated by Happy Cruises. Happy Cruises' four sole shareholders are Alfonso López Pérez, Javier Gómez-Navarro, Ángel Prieto Rebolla, and Abdelmalek Alkarea.

42. Quail Cruises is also not an alter ego of Happy Cruises. Quail Cruises is a wholly owned subsidiary of Quail Travel. Quail Cruises served as a cruise-operating company through 2009, and later served to retain crews that operated the hotel side of cruises operated by Happy Cruises.

43. I have also been informed of another action, styled *Jewel Owner Ltd. et al. v. Quail Cruises Ship Mgmt. Ltd.*, No. 13-16302 CA 40 (Fla. Cir. Ct. filed May 7, 2013) (the "*Jewel* action"), where the plaintiffs, Jewel Owner Ltd. and Pearl Owner Ltd. (collectively, the "Owners"), have sued Quail Cruises (not Quail Travel) and claimed that the majority of the Settlement Proceeds are due to the Owners by way of a settlement agreement between Quail Cruises and the Owners wherein Quail Cruises allegedly agreed pay the Owners certain sums received from the *Pacific I* action. From what I understand, on May 7, 2013, the court in the *Jewel* action entered an order enjoining CVC from discharging the Settlement Proceeds contingent on the Owners posting a bond in the amount of $100,000, which I understand was posted on May 10, 2013.

44. Actions taken in the *Hainan* and *Jewel* actions have prevented the Spanish Proceeding from moving forward. The debt owed to Quail Travel is the only known remaining asset of Quail Travel. The proceedings cannot continue without the Settlement Proceeds. Once the Settlement Proceeds are received by Quail Travel, I will be able to negotiate a plan with the creditors and the creditors will then be able to vote on the plan. In addition, the Spanish Mercantile Court will be able to resolve any creditor claims regarding the plan. And, once the plan is in place and the claims are resolved, I will be able to distribute Quail Travel's assets to the creditors. Finally, once the assets are distributed, Quail Travel will be allowed to liquidate.

45. None of the foregoing will happen, however, until Quail Travel receives the Settlement Proceeds that are due to it pursuant to the Global Settlement Agreement that I negotiated, authorized, and executed on behalf of Quail Travel for the benefit of its creditors.

46. Finally, I note that the Spanish Mercantile Court is a convenient and competent court to resolve any issues or disputes concerning the Settlement Proceeds. In fact, the Owners have appeared through counsel in the Spanish Proceeding. Specifically, on March 4, 2013, the Owners filed an application before the Spanish Mercantile Court claiming to have an "interest" in the Spanish Proceeding by virtue of their settlement agreement with Quail Cruises which, they claim, entitles them to the Settlement Proceeds. On March 12, 2013, the Spanish Mercantile Court issued a Direction (Diligencia de Ordinación) admitting the Owners' assertion of an "interest" in the Spanish Proceeding and allowing the Owners' counsel to appear in the Spanish Proceeding to take, in the words of the Owners' counsel, "whatever steps are deemed necessary to try to protect Owners' alleged interest." I am not aware of any impediment to Hainan from taking similar action. Further, I have been informed that Hainan represented in the *Pacific I* action that it has Spanish counsel and represented in the *Hainan* action that it acquired a copy of the Settlement Agreement through the Spanish Proceeding.

## SECTION 1515(c) STATEMENT

47. In accordance with 11 U.S.C. § 1515(c), the only foreign proceeding with respect to the Debtor that is known to me is the Spanish Proceeding.

\* \* \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 15, 2013

Ángel Juan Miró Martí

Por la Administración Concursal.

#23180344_v3